STATE OF MAINE                                      SUPERIOR COURT
                                                      CIVIL ACTION
YORK, ss.                                       DOCKET NO. AP-08-039


JILL CUNHA and
TIM LUNA,

            Petitioners


      v.                                    **ORDER**



DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

            Respondent


Jill Cunha and Tim Luna, foster parents, appeal from the final action of the

Commissioner of the Department of Health and Human Services (DHHS), pursuant to

22 M.R.S.A. § 4088 (2007). The Commissioner rejected the administrative hearing

officer's recommended decision, substantiated Ms. Cunha and Mr. Luna for abuse or

neglect, and affirmed the denial of their application to renew their Family Foster Care

license. The petitioners contend that the Commissioner's decision contains errors of

law, is not supported by adequate evidence on the record, and is a result of an arbitrary

review amounting to an abuse of discretion. Taken as a whole, the record does not

support the Commissioner's conclusions. Her final action will be vacated and the

matter remanded for further proceedings consistent with the court's findings.

## BACKGROUND

In 2007 Ms. Cunha and Mr. Luna were licensed to run a "regular" Family Foster

Home for up to four female children ages 2 to 8. (Exh. D4 at 2, 5.) The petitioners were

not licensed as a "specialized" or "therapeutic" foster home authorized to take in

"moderately to severely handicapped children having mental, physical and emotional problems ...." 10-148 C.M.R. Ch. 15. Summary (2009); (*see* Exh. D4 at 2, 5.) The petitioners first received their license on June 22, 2000, and their last license expired on October 31, 2007. (Exh. D4 at 2, 5.)

At the time relevant to this appeal Ms. Cunha and Mr. Luna lived with Ms. Cunha's 20-year-old daughter, Caetlin, Caetlin's infant daughter Haley, and Ms. Cunha's 17-year-old daughter Valerie. (Administrative Hearing Recommendation, hereafter AHR) They shared their residence with four foster children, all of whom had been assessed by DHHS as requiring therapeutic foster care before being placed into the petitioners' home. (June 26, 2008 Hearing at 149.) Three of the foster children were 8 years old: the twins Hy and Hh, and CC. (AHR at 8.) CR, the fourth foster child, was 14 years old when placed with the petitioners on February 5, 2007. (AHR at 7–8.) CR had a history of sabotaging foster-care placements, and had just been released from Acadia Hospital where she was treated for suicidal ideations that occurred during her prior placement. (AHR at 7–8.) Immediately before CR joined the petitioners' household, the twins Hy and Hh had left the home to attempt a reunification with their birth mother. (AHR at 8; Exh. D4 at 6.) The attempt failed, and the twins returned to Ms. Cunha's care shortly after CR's arrival. (AHR at 8.)

On the evening of May 19-20, 2007, an incident occurred that resulted in CR permanently leaving the petitioners' home. (*See* Exh. D4 at 1.) This incident led to the petitioners being referred to DHHS on June 28, 2007, under allegations of neglect. (Exh. D4 at 1.) In September 2008 an initial investigation conducted by investigator Michele Robertson concluded that Ms. Cunha and Mr. Luna were substantiated for neglect and an indication of emotional abuse "for failure to supervise [CR] which led to the child being able to seriously cut herself and for failing to provide appropriate/immediate

medical treatment for the injured child." (AHR at 11; Exh. D4 at 16.) The investigation also found violations of the licensing requirements for a Family Foster Home, and in November 2008 the petitioners' license renewal application was denied. (Exh. D4 at 16; AHR at 1.) These actions were upheld after a review. (AHR at 1.)

Ms. Cunha and Mr. Luna appealed and the Commissioner appointed attorney Jeffrey Strickland to serve as hearing officer and conduct a de novo inquiry. (AHR at 1.) The Commissioner's order of reference, dated February 4, 2008, identified the specific issue for consideration to be: *"Was the Department correct when it found that Jill Cunha subjected the child and/or children named in the substantiation letter of September 28, 2007 to abuse or neglect or failed to protect the child and/or children from abuse or neglect?"* (AHR at 1.) Nine days of hearings were held in the spring and early summer of 2008. After hearing all the testimony and reviewing the parties' exhibits, the hearing officer concluded that Ms. Cunha "did not perpetrate abuse or neglect against CR" or violate any licensing rules. (AHR at 10–11.) In his recommended decision issued on September 5, 2008, the hearing officer made extensive findings of fact and explained the reasons for his decision at length. (*See* AHR at 7–10, 11–20.) The material facts included:

- 7. On May 19, 2007, at approximately 5:00 pm, Claimant Jill Cunha arrived at her residence with her daughter Valerie and granddaughter . . . after running some errands.

- 8. At that time, Claimant was informed ... that CR had been behaving disruptively during Claimant's absence, to include arguing with Claimant's daughter Caetlin, shouting at the other foster children, and throwing a pencil or pencils in the house.

- 9. Following the above, CR announced that she was leaving the Family Foster Home and then began packing her clothing and personal effects.

- 10. Following a series of telephone conversations between Claimant, CR, Counseling Services, Inc., and [DHHS], Claimant Jill Cunha informed CR to the effect that alternate accommodations could not be

3

arranged for her that evening, that she (Ms. Cunha) was going to bed now, and that CR should do the same.

- 11. During the course of the above events, CR had remained adamant that she was leaving the Foster Home and continued with packing up her possessions.

- 12. Following her last conversation with CR, Claimant went to her bedroom, locked the door, changed into bedclothes, and called her friend Lori Markie.

- 13. At approximately 10:30 pm that evening, shortly following the above, CR came to Claimant's door, tried the knob, and announced that she was going to cut herself and get blood on Claimant's rug.

- 14. Immediately following the above, CR went from Claimant's door back to the kitchen.

- 15. Claimant at that time got up and went to the kitchen, where she found CR seated at the kitchen table, repeatedly cutting her right forearm with a steak knife.

- 16. Upon seeing the above, Claimant immediately ordered CR to stop cutting herself . . . at which point CR ceased cutting herself, rinsed the knife off in the sink and started to put it into the dishwasher; Claimant at that time told CR to throw the knife away (into the trash) instead.

- 17. Following the above, Claimant called [DHHS] (Child Protective Intake) and informed them as to what had occurred.

- 18. Claimant next drove CR to the local police station, approximately one mile from the residence and collocated with the local fire department/EMS.

- 19. Finding the police station to be closed at that time, Claimant next drove back to the residence with CR and left CR in the car, parked in the driveway, while she (Claimant) called 911 regarding the situation.

- 20. The telephone from which Claimant called 911 was mounted on the wall directly adjacent to a door opening on, and allowing direct observation of, the driveway.

- 21. After deciding that she would drive CR to the hospital herself, Claimant secured CR's MaineCare card and a few other items and then took CR to York Hospital, meanwhile leaving her daughter Caetlin in charge of the other children.

4

- 22. CR was seen in triage and subsequently admitted to York Hospital at approximately 11:10 pm on May 19, 2007.

- 23. Upon admission to York Hospital, CR was first interviewed by Crisis Response Service personnel and afterward received medical treatment for superficial lacerations of her right forearm.

- 24. Following the above, CR remained at York Hospital and was subsequently placed elsewhere, based on Claimant's refusal to take CR back.

- 25. Hy and CC, who had been involved in ongoing therapy since shortly after CR's placement with Claimants, related nothing regarding the above events or otherwise indicated any awareness of those events to their therapist during subsequent treatment sessions.

- 26. Claimant was instructed by the children's therapist not to bring up the events of May 19, 2007, with Hy and CC.

- 27. No behavioral changes were observed in Hy or CC by their teachers following the events in question, other than in connection with her eventual removal from Claimant's Family Foster Home.

- 28. Claimant maintained continuous contact with [DHHS] concerning CR's care needs throughout the course of CR's placement with Claimants.

- 29. Claimant participated in Department-sponsored intervention concerning CR, to the extent such was made available, throughout the course of CR's placement with Claimants.

- 30. Claimant facilitated, to the extent practicable, scheduled telephone contacts between CR and her natural parents throughout the course of CR's placement with Claimants.

(AHR at 8–10.)

From the above, the hearing officer concluded that Ms. Cunha and Mr. Luna had not perpetrated abuse or neglect against CR per 22 M.R.S.A. § 4002(1) (2008)[1] and had not violated Rules 9.A(2), (5), (10), 9.C, or 9.D(2) of 10-148 C.M.R. Ch. 16 by: failing to be emotionally stable individuals able to exercise good judgment; failing to understand

---

[1] "'Abuse or neglect' means a threat to a child's health or welfare by physical, mental or emotional injury or impairment, sexual abuse or exploitation, deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S.A. § 4002(1) (2008).

and meet the developmental and individual needs of children; failing to accept the relationship of CR with her family or cooperate with visitation arrangements; by subjecting CR to verbal abuse or derogatory remarks about her or her family; or "by failing to provide supervision and care meeting the needs of CR's age, level of development, independence, and responsibility." (AHR at 11–12.)

In discussing his conclusions, the hearing officer explained "there is insufficient basis in the facts presented on which to base a conclusion that Claimant Jill Cunha perpetrated abuse or neglect upon CR as those terms are defined in the applicable statute. (AHR at 17.) Instead, the evidence showed "that CR had a history of self-injurious tendencies" that predated her involvement with the petitioners. (AHR at 17.) The petitioners were "neither licensed nor trained to provide [the] therapeutic level Foster Care" CR required, and were not fully aware of CR's history when they accepted the placement. (AHR at 12.) Ms. Cunha "gradually became aware of CR's extensive requirements" and communicated her behaviors to CR's caseworker while fully participating in "Department-sponsored intervention (CSI-ACT meetings) to the extent such assistance was made available." (AHR at 13.) DHHS often cancelled these meetings due to CSI staff unavailability. (AHR at 13.)

Regarding CR's biological parents, the hearing officer explained that there was no evidence that Ms. Cunha or Mr. Luna had actually discouraged or interfered with CR's ability to contact and communicate with her parents. (AHR at 13.) While the home only had one phone line and CR was once interrupted during a conversation with her mother, the hearing officer found that this did not amount to an attempt to deprive CR of parental contact. (AHR at 13.) Similarly, the "derogatory remarks" DHHS accused Ms. Cunha of making about CR's parents related to CR's parents' failure to adhere to an agreed-upon phone schedule. (AHR at 13.) CR's parents were responsible for "initiating

and terminating telephone calls according to schedule, but were often remiss in doing so...." (AHR at 13.) This did not constitute a sufficient basis to support DHHS's allegations.

Leading up to the night of May 19, 2007, "CR was subject to various emotional stressors outside of [the petitioners'] control ... includ[ing] contact with her natural mother during which CR was informed by her mother that she (CR) ... would remain in foster care until age 18." (AHR at 13.) CR's mother also told "CR that she (CR's natural mother) was going to be living in a homeless shelter." (AHR at 13.) CR had also "attended a school dance earlier in the week ... which unfortunately proved to be a very disappointing experience ..., that she reported feeling ill prior to going to work and that she began her period at work that day." (AHR at 14.)

On the evening of the incident, Mr. Luna was at work and Ms. Cunha had left Caetlin in charge while she spent the afternoon helping her daughter Valerie prepare for Valerie's high school prom. (AHR at 14, 19.) When Ms. Cunha returned, the other foster children told Ms. Cunha that CR had been acting out. (AHR at 14.) CR threw some paper cups at Ms. Cunha and swore at her, threw some toys that were in the living room, and began to pack her personal effects into garbage bags. (AHR at 14.) She repeatedly asserted that she was leaving the home, and asked "to call 1-800-HELP or 774-HELP in order to effect her removal from the Cunha/Luna residence." (AHR at 14.) Ms. Cunha told CR that they could call the Counseling Services Inc. (CSI) crisis line after the other children were put to bed. (AHR at 14.)

Ms. Cunha did call the CSI crisis line "and related what had been going on with CR up to that point, indicating that CR was packing up her belongings as she had done on previous occasions when upset.... [T]he CSI worker asked if CR was out of control or yelling at that point, to which Ms. Cunha replied in the negative." (AHR at 14.)

Following the call, CR asked whether Ms. Cunha had called "and indicated that she (CR) wished to talk to crisis personally. Ms. Cunha therefore agreed to call CSI back after the other children were put to bed, which she did; Ms Cunha was informed at that time that she needed to call DHHS instead." (AHR at 14.)

Ms. Cunha did call DHHS and then handed the phone to CR, who took it into her room to speak with the worker. (AHR at 14.) During this conversation the evidence shows that Ms. Cunha's "daughter Caetlin picked up the phone and asked CR to be quiet so as not to wake the baby." (AHR at 14.) When CR had finished speaking to the intake worker, she returned the phone to Ms. Cunha. (AHR at 14.) The intake worker then told Ms. Cunha that a duty worker would call Ms. Cunha back. (AHR at 14.) DHHS's "records indicate that CPI had attempted to calm CR down and that '[CR] said that she was going to kill herself if she had to stay [in the Cunha/Luna household] any longer.'" (AHR at 15.)

At 9:14 pm duty worker Christina Smith called Ms. Cunha, who informed Ms. Smith of the recent stressful events in CR's life. (AHR at 15.) DHHS's records indicate that:

> Ms. Cunha informed Ms. Smith that CPI had managed to calm CR down, that CR was just following her around the house at that point, and that Ms. Cunha did not feel that CR was at risk of hurting herself at that point. Ms. Cunha further informed the worker that CR "routinely threatens to hurt herself but has never followed through, she packs her things, but doesn't leave."
>
> … Ms. Smith concluded the telephone call by advising Ms. Cunha "to just go to [CR], tell her that she is ready to pull the plug on today, wish [CR] sweet dreams and hope that she feels differently tomorrow."

(AHR at 15.)

Ms. Cunha relayed this conversation to CR, telling her that DHHS could not move her that night and that she (Ms. Cunha) was going to bed. (AHR at 15.)

8

> The evidence indicates that Ms. Cunha then went to her room, locked the door, changed into bedclothes and called her friend Lori Markie. While Ms. Cunha was on the phone with Ms. Markie, CR came to the door and tried the doorknob; finding the door to be locked, CR then announced that she had a knife and that she was going to cut herself and get blood on Ms. Cunha's carpet.

(AHR at 15.)

Evidence in the record conflicted on whether Ms. Cunha did or did not fear for her own safety at this moment. (AHR at 17.) The hearing officer determined that it was "immaterial, although it would not necessarily have been unreasonable for her to be fearful under the circumstances." (AHR at 17.) At the hearings Ms. Cunha testified "that she was able to see CR's shadow under the door, that she was able to detect CR moving away from the door (toward the kitchen) immediately upon making her announcement and that she (Ms. Cunha) got up and opened the door as soon as CR's shadow disappeared from the threshold" all in the course of a few seconds. (AHR at 15.) She further testified that she followed CR to the kitchen, stopping en route to alert her daughter Caetlin and ask her to check on the other children. (AHR at 16.) Ms. Cunha remained on the telephone with Ms. Markie until entering the kitchen where she found "CR seated at the table and cutting her forearm repeatedly with a steak knife." (AHR at 16.) Ms. Cunha hung up with Ms. Markie and "firmly told CR to stop ... whereupon CR stopped cutting herself" and told Ms. Cunha, "now I'll get the f___ out of here." (AHR at 16.) CR rinsed the knife in the sink and began to place it in the dishwasher, but Ms. Cunha told her to put it in the garbage which CR did. (AHR at 16.)

At 10:30 pm Ms. Cunha paged Ms. Smith, who called back and "suggested that Ms. Cunha call mobile crisis but could not provide her with a number." (AHR at 16.) Ms. Cunha testified that she then told CR to cover her wounds and put on a coat, but that CR refused and indicated that she would not place any covering on her arm. (AHR

9

at 16.) Ms. Cunha then drove CR to the local police/EMS station approximately one mile from the residence. (AHR at 16.) On finding it closed, they returned to the home and Ms. Cunha called 911. (AHR at 16.) CR stayed in the vehicle while it was parked in the driveway. (AHR at 16.) "After speaking with the 911 operator, Ms. Cunha elected to drive CR to the hospital herself versus waiting for an ambulance, leaving Caetlin in charge of the other children." (AHR at 16.) DHHS determined that Ms. Cunha wanted to avoid calling an ambulance "to avoid the disturbance of having sirens and lights arrive at the residence late at night." (AHR at 16.) Ms. Cunha also testified that her actions were motivated by the belief that removing CR from the home as quickly as possible would avoid further escalation of CR's crisis. (AHR at 18.)

Ms. Cunha retrieved CR's MaineCare card and some other items, then departed for York Hospital. (AHR at 16.) CR was admitted and "treated for multiple superficial lacerations to her right forearm (wounds irrigated and closed with surgical adhesive) after being seen by a Crisis Response Services worker." (AHR at 16.) At least 50 minutes elapsed from the time CR arrived at the hospital and the time her wounds were treated. (AHR at 16.) Ms. Cunha returned home to retrieve the belongings CR had packed into trash bags as well as her medications. (AHR at 16.) Ms. Cunha's 17-year-old daughter Valerie had returned from the prom and accompanied Ms. Cunha back to the hospital. (AHR at 16.) DHHS reported that "Valerie was behaving flippantly or inappropriately at the hospital, causing the person at the hospital desk to ask as the two were leaving the hospital, 'do you have a problem?', to which Valerie responded that she did not. . . . There is no evidence that the alleged, unspecified behavior by Valerie" was witnessed by CR. (AHR at 16.)

From the above, the hearing officer found that "the evidence does not support that Ms. Cunha in some way actually caused CR to injure herself on the evening in

10

question." (AHR at 17.) The record also did not support DHHS's suggestion "that Ms. Cunha barricaded herself in her room and refused to intervene or even to request appropriate assistance for CR, who she knew to be standing on the other side of the door cutting herself with a knife and possibly even preparing to visit similar violence upon the other children sleeping in their room." (AHR at 17.) Instead, as the evening's events unfolded there was no indication "that CR was showing any sings of harming herself ... [and] Ms. Cunha believed that CR was not going to injure herself, based on her telephone conversations with [DHHS]." (AHR at 17.) At Ms. Smith's suggestion, Ms. Cunha went to bed. (AHR at 17.) When CR did knock on Ms. Cunha's door and announce her threat, "the evidence supports that CR immediately went from Ms. Cunha's bedroom door to the kitchen ... and that Ms. Cunha immediately got up and went to the kitchen to assess the situation; Ms. Cunha remained on the phone with her friend during the time and related to her what was happening." (AHR at 17.)

The hearing officer concluded: "Ms. Cunha's actions were not inappropriate under the circumstances." (AHR at 17.) Given CR's prior threats, Ms. Cunha had no reason to believe that she was actually following through with her promise to cut herself until witnessing the act in the kitchen. (AHR at 17.) Thus, "Ms. Cunha's actions were, under the circumstances, at least as sensible as hanging up with Ms. Markie, calling 911, and attempting to communicate with a 911 operator while simultaneously trying to determine what was actually happening." (AHR at 17.) The evenings' "events occurred in rapid succession, and there was simply nothing that Ms. Cunha reasonably could have done to prevent this from occurring." (AHR at 18.) All of her "actions were reasonable and appropriate under the circumstances." (AHR at 18.)

Turning to the events following May 19–20, 2007, the hearing officer noted that DHHS maintained: "The fact that [Ms. Cunha] has consistently denied the possibility

11

that these children were impacted by the incident demonstrates lack of good judgment." (AHR at 18.) While the evidence indicated that the children Hy and CC eventually reported hearing the incident and being frightened, evidence also supported Ms. Cunha's belief that the children had not been negatively impacted. (AHR at 19.)

The children's counselor, Melissa Ianaconne, testified that the children never mentioned the incident during therapy, and Ms. Ianaconne advised Ms. Cunha not to bring the subject up. (AHR at 19.) Ms. Ianaconne also testified that the children "were thriving and well-cared for by Ms. Cunha, and that Ms. Cunha had always been responsive, appropriate, and very dedicated in her dealings with her." (AHR at 19.) Audry Yeaton, Hh's counselor, "similarly testified that, to her knowledge, the children were not aware of the cutting incident involving CR." (AHR at 19.) The children's teachers also testified that "no changes in behavior were noted in any of the children following the cutting incident" until the children were removed from Ms. Cunha's care." The teachers believed that "Ms. Cunha was actively involved in the children's education, that all three children appeared well-cared for, and that they were well-adjusted, happy, and generally doing well in school while in her care." (AHR at 19.)

Turning to Mr. Luna, the hearing officer briefly noted that "no findings were described in [DHHS's] notice concerning Mr. Luna relative to the denial of application for renewal of the couple's Family Foster Home license." (AHR at 19.) Mr. Luna was working during the evening of May 19, 2007, and usually works forty-seven hours per week at night. (AHR at 19.) His involvement with the children was appropriate to his work schedule. (AHR at 19.)

Taking the record as a whole, the hearing officer believed that "the evidence in this case does not support that [DHHS] was correct in finding that [the petitioners] subjected CR to abuse or neglect or failed to protect CR from abuse or neglect, or in

12

denying [the petitioners'] application for renewal of a Family Foster Home license." (AHR at 19–20.)

The hearing officer's recommendation went to the Commissioner for review, with responses and exceptions filed by both parties. The petitioners' exception was not considered because it arrived late. In her final decision dated November 13, 2008, the Commissioner declined to accept the hearing officer's findings of fact numbered 15 and 29. Finding of fact 15 stated that after CR threatened to cut herself and left Ms. Cunha's door,

> Claimant at that time got up and went to the kitchen, where she found CR seated at the kitchen table, repeatedly cutting her right forearm with a steak knife.

(AHR at 8–9.) The Commissioner instead found:

> Ms. Cunha waited to make sure that CR was not still outside her bedroom door, and that Ms. Cunha then waited to see if CR was going to come back before she got up to go into the kitchen.

(Final Decision at 1.) The hearing officer's finding of fact 29 stated:

> Claimant participated in Department-sponsored intervention concerning CR, to the extent such was made available, throughout the course of CR's placement with Claimants.

(AHR at 9.) The Commissioner rejected this and instead found:

> [A]lthough Ms. Cunha received services from [CSI] regarding how to deal with CR, Ms. Cunha did not follow the recommendations from Michael Mahar, Clinician for [CSI], which included instructions that Ms. Cunha not allow her biological children to drive CR around and instructions that Ms. Cunha was to maintain her role as the parental figure."

(Final Decision at 1.)

Moving on from the hearing officer's findings of fact, the Commissioner stated:

> I also decline to accept the Hearing Offer's conclusions, found at pages 10–11 of the Recommended Decision. Instead, I find the opposite for each conclusion. I base my determination on the simple fact that it is

unacceptable for a foster parent to behave the way Ms. Cunha did on the night in question.

(Final Decision at 1.) The Commissioner cited the following facts, implicitly overruling or modifying the hearing officer's inconsistent findings:

- "Ms. Cunha knew of CR's history of engaging in unsafe behavior" and had ongoing problems with her behaviors.

- "Ms. Cunha knew that CR was highly upset, but minimized CR's threats."

- Ms. Cunha went into her bedroom to escape CR because CR was following her around.

- "Ms. Cunha inexplicably decided to stay in her bedroom, talking to her friend on the phone, despite the fact that CR was standing outside her bedroom door, threatening to cut herself with a knife."

- "Ms. Cunha failed to check on, or show concern for, the safety of the other three children who were sleeping next door to Ms. Cunha's bedroom while CR was outside the door threatening to cut herself."

- "[T]he children were negatively impacted by the cutting incident and ... Ms. Cunha's consistent denial of the possibility that these children were impacted by the cutting incident demonstrates a lack of good judgment."

- Ms. Cunha failed to obtain prompt medical attention for CR.

- Ms. Cunha spoke negatively about CR's biological family on more than one occasion.

- Mr. Luna failed to fulfill his supervisory role over CR.

- Ms. Cunha and Mr. Luna "[m]ore often than not" left Ms. Cunha's daughter in charge of CR.

(Final Decision at 1–2.) The Commissioner was also deeply troubled by Ms. Cunha's inconsistent statements on whether she was afraid or not, whether she waited for CR to leave the door or not, and whether she waited to see if CR was coming back before opening the door. (Final Decision at 1–2.)

On the events of May 19, 2007, the Commissioner agreed with the Department's position that Ms. Cunha's refusal to allow CR to use the phone to call for help, Ms. Cunha's taking the phone into the bedroom and locking the door, and Ms. Cunha's failure to respond to CR's threats to cut herself, escalated CR to the point where she did, in fact, cut herself. Ms. Cunha failed to keep her eyes on CR and/or take other appropriate action to prevent injury to CR and/or the other children in the home at that time. In fact, the record supports that Ms. Cunha failed to check on, or show concern for, the safety of the other three children who were sleeping next door to Ms. Cunha's bedroom while CR was outside the door threatening to cut herself. Ms. Cunha's actions were inappropriate ....

(Final Decision at 2.) In closing, the Commissioner found that the Department correctly denied Ms. Cunha and Mr. Luna's application for a license to operate a Family Foster Home, and that "Ms. Cunha did perpetrate neglect against CR," and that the petitioners violated the rules for the Licensing of Family Foster Homes as alleged. (Final Decision at 2.)

On December 11, 2008, Ms. Cunha and Mr. Luna petitioned this court for judicial review pursuant to M.R. Civ. P. 80C. The petitioners contend that the Commissioner's final decision was arbitrary and capricious insofar as she did not engage in any meaningful review of the hearing officer's recommendations, made findings unsupported by the record, and drew erroneous legal conclusions. They request that this court vacate and reverse the Commissioner's decision.

## DISCUSSION

When reviewing an agency decision in its appellate capacity, the court directly examines the record before the agency and reviews its decision for errors of law, abuses of discretion, or "factual findings not supported by substantial evidence in the record." *Kane v. Comm'r of the Dept. Health & Human Servs.*, 2008 ME 185, ¶ 12, 960 A.2d 1196, 1200 (quoting *Wheaton v. Dep't of Health & Human Servs.*, 2008 ME 48, ¶ 5, 943 A.2d 568, 570) (quotations omitted). When reviewing the record the court must determine "whether, on the basis of all the testimony and exhibits before it, the agency could fairly

15

and reasonably find the facts as it did." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 13, 989 A.2d 1128, 1133 (quoting *Int'l Paper Co. v. Bd. of Envtl. Prot.*, 1999 ME 135,¶ 29, 737 A.2d 1047, 1054) (quotations omitted). The court will only reverse the agency's decision if the "record compels a contrary conclusion to the exclusion of any other inference." *Kelley v. Me. Pub. Empls. Ret. Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676, 682 (quoting *Hale-Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232, 1237) (quotations omitted).

Based on Ms. Cunha's actions on the night of May 19-20, 2007, DHHS found "a Substantiation of Neglect to CR for failure to supervise her" and "an Indication of Emotional Abuse to the three younger children in the home for subjecting them to emotional distress ...." (Exh. D4 at 17; Exh. D5 at 1.) DHHS's policy manual states that a "Substantiated finding means that, by a preponderance of the evidence, a [caregiver] has caused and/or is likely to cause high severity child abuse and neglect." Me. Dep't of Health & Human Servs., Child and Family Servs. Policy Manual § IV. D-1 (Aug. 10, 2005). A substantiated "person is considered a danger to children." *Id.* A lesser "Indicated finding means that ... [a caregiver] has caused and /or is likely to cause low/moderate severity child abuse." *Id.* An individual substantiated of abuse or neglect has his or her name placed in a database accessible to many potential employers and is severely hampered in obtaining or maintaining a foster care license. *Id.*; *see* 22 M.R.S.A. §§ 4008, 4088, 7703 (2009); *Kane*, 2008 ME 185, ¶¶ 17–18, 23, 960 A.2d at 1201–02.

"Abuse or neglect" is defined as "a threat to a child's health or welfare by physical, mental or emotional injury or impairment, sexual abuse or exploitation, deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S.A. § 4002(1) (2007); Me. Dep't of Health & Human Servs., Child and Family Servs. Policy Manual § IV. D-1 (Aug. 10, 2005). While "abuse or neglect" in

16

a substantiation finding "may require a somewhat lesser finding" than the serious abuse or neglect necessary to support a finding of jeopardy, "a substantiation finding must be based on an understanding that 'abuse or neglect' means ... something more than imperfect, overly rigid, or even deficient parenting." *Kane*, 2008 ME 185, ¶ 24, 960 A.2d 1196, 1203.

At the outset it is worth noting that when the Commissioner rejected the hearing officer's recommendation on November 13, 2008, the nine days of hearing testimony only existed as some forty-five hours of electronic recording. (*See* Barbara Johnson Aff. in Support of Motion to Enlarge Time to File Certified Record ¶ 4.) Transcripts were not prepared until early 2009. (*See Id.* ¶¶ 5–6.)

The Commissioner explicitly found that when CR knocked on Ms. Cunha's door and threatened to cut herself, "Ms. Cunha waited to make sure that CR was not still outside her bedroom door, and that Ms. Cunha then waited to see if CR was going to come back before she got up to go into the kitchen." (Final Decision at 1.) The first portion of this finding, that "Ms. Cunha waited to make sure that CR was not still outside her bedroom door," does have literal support in the record. However, the evidence does not support the inference that Ms. Cunha was indifferent or slow to react.

Ms. Robertson reported that Ms. Cunha stated that "she did not open the door," but "waited, still on the phone with her friend, until she saw that [CR] had left and then opened her door." (Exh. D4 at 8.) Ms. Robertson later testified that she did not ask either Ms. Cunha or CR how much time elapsed between the initial knock and Ms. Cunha's reaction. (May 7, 2008 Testimony of Michele Robertson at 74, 78, 80; June 30, 2008 Testimony of Michele Robertson at 153, 175–76.) She admitted that she was unclear on the timeline of the evening's events, that the time between the knock and Ms. Cunha's reaction could have been mere seconds, and that the entire episode probably lasted no

17

more than a minute or two. (May 7, 2008 Testimony of Michele Robertson at 74, 78, 80; June 30, 2008 Testimony of Michele Robertson at 153, 175–76.)

Ms. Cunha testified that she did not move until CR moved away from the door. (June 30, 2008 Testimony of Jill Cunha at 25). She also testified that CR began to move away from the door immediately after knocking and announcing that she would cut herself. (June 26, 2008 Testimony of Jill Cunha at 42.) This means that she'waited approximately one or two seconds before reacting to the threat. (June 26, 2008 Testimony of Jill Cunha at 42.) This is matched by Ms. Markie's impression of events, and does not contradict Ms. Robertson's findings. (June 16, 2008 Testimony of Lori Markie at 92–93; see Exh. D4 at 8.)

The second portion of the Commissioner's finding, that "Ms. Cunha waited to see if CR was going to come back before" leaving her room, is supported by an unsigned, undated account apparently prepared by Ms. Cunha.[2] (Exh. D10 at 4.) This characterization is not found in investigator Robertson's report. (See Exh. D4 at 8.) It also does not directly contradict the evidence in the record regarding time. Ms. Cunha, whose testimony DHHS cites for support, stated that when she saw CR's shadow move away from her door she immediately began to follow. (June 30, 2008 Testimony of Jill Cunha at 24.) Lori Markie, who was on the phone with Ms. Cunha at the time of the incident, corroborated Ms. Cunha's account. (June 16, 2008 Testimony of Lori Markie at 92–93.) Accepting the Commissioner's determination that Ms. Cunha waited, the entire record shows that the wait was momentary.

---

[2] DHHS did not cite to this portion of the record when asked to provide evidence supporting the Commissioner's decision. DHHS instead directed the court to Ms. Cunha's testimony, which does not support the Commissioner's position.

The Commissioner's second express finding of fact stated that:

> [A]lthough Ms. Cunha received services from [CSI] regarding how to deal with CR, Ms. Cunha did not follow the recommendations from Michael Mahar, Clinician for [CSI], which included instructions that Ms. Cunha not allow her biological children to drive CR around and instructions that Ms. Cunha was to maintain her role as the parental figure."

The record shows that Ms. Cunha did indeed receive services from CSI, though she complained that they were frequently cancelled and were not adequate to meet either her own or CR's needs. (Exh. D9 at 1; Exh. D10 at 36, 38, 43; D14 at 8–9.) The evidence also indicates that due to Mr. Luna's work schedule, Ms. Cunha had to allow her adult daughter Caetlin to supervise the children in order for Ms. Cunha to take full advantage of the support available. (*See* D10 at 38.) This placed Ms. Cunha in the difficult position of having to occasionally disregard CSI's recommendations in order to receive CSI's support.

The record does support that by May 19, 2007, Ms. Cunha knew CR had a history of unsafe behavior and knew that she was upset on the evening in question, though CR's therapist Michael Mahar testified that he did know of any incidents where CR had actually cut herself. (Exh. D14 at 14; May 22, 2008 Testimony of Michael Mahar at 18.) The evidence does not, however, support the Commissioner's inference that Ms. Cunha "minimized CR's threats" when speaking with CSI and DHS representatives. As events unfolded on May 19, 2007, Ms. Cunha spoke with crisis workers four times in an attempt to obtain assistance. (June 26, 2008 Testimony of Jill Cunha at 34, 207–08, 215–16, 221, 223, 225–29, 231; June 30, 2008 Testimony of Jill Cunha at 14–15, 17.) CR would become upset with Ms. Cunha, ask her to call DHHS, and then go to her room to pack for approximately twenty minutes before the next encounter. (Exh. D14 at 13–14; June 26, 2008 Testimony of Jill Cunha at 201–03, 207–10, 214–16, 221, 223, 225–27,229–31; June

19

30, 2008 Testimony of Jill Cunha at 14–17; *see* May 7, 2008 Testimony of Michele Robertson at 69–70 (CR's pattern was to go in and out).) Ms. Cunha testified that during each call she told the crisis workers what had transpired, answered their questions, and told them that CR was quietly packing her belongings at the time of the call. (June 26, 2008 Testimony of Jill Cunha at 34, 207–10, 223, 225–28; June 30, 2008 Testimony of Jill Cunha at 15.) Nothing in the record contradicts Ms. Cunha's account.

Ms. Robertson did conclude that Ms. Cunha must have minimized CR's threats because the advice Ms. Cunha received from DHHS ultimately did not prevent CR from cutting herself. (May 7, 2008 Testimony of Michele Robertson at 69–70.) This conclusion appears to be suspect. It starts with the premise that Ms. Cunha caused CR to cut herself. Since Ms. Cunha was following the advice of DHHS duty worker Christina Smith immediately before the cutting occurred, Ms. Cunha must have given Ms. Smith bad information; otherwise, Ms. Smith would have prevented Ms. Cunha from allowing CR to cut. Minding that Ms. Cunha was not trained or licensed to handle a highly-troubled child like CR, it is not clear how DHHS would have reacted if Ms. Cunha had *not* followed Ms. Smith's advice and CR had cut herself. The court does not need to speculate. The essential point is that nothing in the record supports the conclusion that Ms. Cunha "minimized" CR's threats.

There is bare support in the record for the Commissioner's finding that "Ms. Cunha went into her bedroom to escape CR because CR was following her around." This does not appear in Ms. Cunha's unsigned narrative account, nor does it appear in her initial interview with Ms. Robertson. (Exh. D4 at 8; Exh. D10 at 4.) So far as the court can ascertain, it first appears in Ms. Robertson's testimony that Ms. Cunha gave three reasons for going to her room: to stop CR from following her, to call Ms. Markie for support, and because she was frightened. (March 31, 2008 Testimony of Michele

Robertson at 235.) The record does strongly indicate that Ms. Cunha also went into her bedroom after Ms. Smith instructed her to tell CR "that she is ready to pull the plug on today, wish [CR] sweet dreams and hope that she feels differently tomorrow." (Exh. D4 at 8; Exh. D10 at 4; Exh. D14 at 14, 17; March 31, 2008 Testimony of Michele Robertson at 233–34; June 30, 2008 Testimony of Jill Cunha at 14; AHR at 8, ¶ 10.)

The Commissioner's finding that "Ms. Cunha inexplicably decided to stay in her bedroom ... despite the fact that CR was standing outside her door, threatening to cut herself with a knife," has already been addressed above. The record does not support the Commissioner's characterization of events. Instead, the record shows that Ms. Cunha moved quickly after CR threatened to cut herself, regardless of the subjective thoughts or emotions she experienced in the moment.

The record lacks positive support for the Commissioner's finding that "Ms. Cunha failed to check on, or show concern for, the safety of the other three children . . . ." Ms. Cunha's initial narrative account of the evening and her interview with Ms. Robertson indicate that she followed CR from her bedroom directly to the kitchen. (Exh. D4 at 8; Exh. D10 at 3; AHR at 8, ¶ 16.) Ms. Cunha later testified that while en route to the kitchen, she stopped to ask Caetlin to check on the other three foster children. (June 30, 2008 Testimony of Jill Cunha at 25, 39.) Caetlin Cunha testified to the same, as did Ms. Markie. (June 16, 2008 Testimony of Lori Markie at 93; June 20, 2008 Testimony of Caetlin Cunha at 212–13.) There is no dispute that Ms. Cunha later opted against calling an ambulance because she was concerned about the sirens waking and frightening the children. (Exh. D4 at 10.) Accepting that Ms. Cunha did not check on the children at the time CR made her threat, it is not wholly correct to say that Ms. Cunha showed *no* concern for their wellbeing that evening.

The Commissioner's determination that the three younger foster children were negatively impacted by the incident has support, but the conclusion that she exercised poor judgment does not. The twins' caseworker, Jill Hunter, interviewed them in August and Ms. Robertson interviewed CC in September, 2007. (Exh. D4 at 12–15.) All had witnessed CR shouting and throwing things early in the evening, and this apparently caused Hy to remember an incident of violence she witnessed in her birth mother's home. (Exh. D4 at 14.) Neither Hy nor Hh reported hearing CR threaten to cut herself or witnessed the act. (Exh. D4 at 12–14; June 16, 2008 Testimony of Jill Hunter at 59–60.) Foster child CC told Ms. Robertson that she had heard CR say something about a knife, and this frightened her. (Exh. D4 at 15.) CR's presence in the home clearly had some negative impact on the younger foster children.

The record also shows that neither Hy nor CC ever mentioned the events of May 19, 2007 to Melissa Ianaconne, their social worker. (June 23, 2008 Testimony of Melissa Ianaconne at 17, 24.) Ms. Cunha approached Ms. Ianaconne and asked whether either of them should talk to the girls about the incident. (June 23, 2008 Testimony of Melissa Ianaconne at 23–24.) Ms. Ianaconne advised her not to bring the subject up, and indicated that she herself would not raise the issue during sessions. (June 23, 2008 Testimony of Melissa Ianaconne at 23–24.) It is difficult to see how Ms. Cunha's decision to follow DHHS's representative's advice constitutes poor judgment. Furthermore, the record indicates that none of the three girls' behavior changed following CR's outburst. To the contrary, Ms. Ianaconne and their teachers Ms. Andrade-Chase and Ms. Dow believed the girls were well cared for and thriving. (June 23, 2008 Testimony of Melissa Ianaconne 29–30; June 23, 2008 Testimony of Julie Dow at 96–97; June 23, 2008 Testimony of Marcia Andrade-Chase at 107–09.) The record shows that Ms. Cunha had every objective reason to believe that the children in her care were not harmed by the

events of May 19, 2007. The Commissioner's conclusion that this belief reflected poor judgment is unsupported.

The Commissioner's finding that Ms. Cunha failed to obtain prompt medical attention for CR is also unsupported by the record. The evidence shows that Ms. Cunha made CR stop cutting herself and immediately called duty worker Ms. Smith to apprise her of the situation and obtain guidance. (Exh. D4 at 10; Exh. D10 at 5; D14 at 14; June 20, 2008 Testimony of Jill Cunha at 28.) Ms. Smith was only able to tell Ms. Cunha that "she should probably call mobile crisis," but was unable to provide her with the phone number. (Exh. D14 at 14.) Believing that an ambulance would wake the other foster children and that forcing CR to remain in the home would risk re-escalating the situation, Ms. Cunha then decided to drive CR to the local police/EMS station where she believed medical assistance would be available. (Exh. D4 at 8, Exh. D10 at 5; June 30, 2008 Testimony of Jill Cunha at 34, 39, 51.) Following the failed attempt to obtain help at the police station Ms. Cunha took CR to the hospital, stopping by the home briefly to check with 911 and gather CR's MaineCare card. (D4 at 8; June 30, 2008 Testimony of Jill Cunha at 39–40, 45.) While Ms. Cunha's belief regarding the police station was mistaken, she did act promptly.[3]

There is record evidence to support the Commissioner's finding that Ms. Cunha spoke negatively about CR's family. When interviewed by Ms. Robertson, CR reported that Ms. Cunha would talk about how her family wasn't "doing what they were supposed to." (Exh. D4 at 11.) No specific instances of such negative talk are identified. The record indicates that these comments may have related to CR's parents' failure to adhere to the calling schedule, an incident where CR's mother encouraged cutting as a way to leave the placement, incidents where CR's mother gave her information that she

---

[3]    There is conflicting evidence regarding Ms. Cunha's attempts to offer first aid.

23

was not supposed to have, and possibly an occasion where CR's mother gave her head lice. (Exh. D4 at 9; Exh. D10 at 17, 20–21, 29–32, 34, 37; Exh. D14 at 8, 10.)

The Commissioner's determination that Mr. Luna failed to fulfill his supervisory role over CR is not supported. Like many parents, Mr. Luna worked the night shift at two separate jobs. (Exh. D4 at 14.) His interaction with the children was limited accordingly. (Exh. D4 at 14.) There is no indication that he failed to act appropriately as an authority figure when present, or that he was not available if needed.

The Commissioner's determination that Ms. Cunha and Mr. Luna left Ms. Cunha's daughter Caetlin in charge "more often than not" has bare support in the record. A preliminary report of alleged abuse prepared by CR's caseworker Suna Shaw states that CR "stated . . . that [Ms. Cunha] had her two daughters do a lot of the parenting of [CR] and other children and that she felt they didnt [sic] like her so they were mean to her." (Exh. D11 at 3.) The record shows that Ms. Cunha's daughter Valerie would often drive CR to school, and her adult daughter Caetlin would watch the children when Ms. Cunha needed to go to DHHS-related meetings or run other errands. (Exh. D10 at 38; Exh. D11 at 3.) It is not clear that the record supports the Commissioner's "more-often-than-not" characterization. Perhaps more importantly, it is not clear that this is legally relevant.

It is not unusual for parents to labor in jobs that keep them from the very families they work to support. It is also common for busy families to rely on older siblings to supervise younger ones when one or both parents are occupied. While these arrangements may not fit the mold of an ideal family, they are the reality for many good families. *See Kane*, 2008 ME 185, ¶ 28, 960 A.2d at 1203 (instances of arguably poor parenting "have likely occurred in the lives of may good, hard-working parents ... striving to accommodate the combined pressures of childrearing and working").

DHHS substantiated Ms. Cunha as a child abuser and denied her and Mr. Luna their Foster Care license based almost entirely on the evening of May 19, 2007. (Exh. D2 at 1–3; Exh. D4 at 17–18.) However, no causal nexus has been shown between Mr. Luna's work schedule or the roles of Ms. Cunha's daughters on one side and CR's self-destructive behavior on the other. Insofar as these may have been factors leading up to CR's crisis, they are joined by CSI's failure to hold all scheduled counseling sessions and DHHS's decision to place and keep CR in a home it knew was neither licensed nor equipped to meet her needs.

The Commissioner did identify three things that she believed caused CR to engage in self-harm: "Ms. Cunha's refusal to allow CR to use the phone to call for help, Ms. Cunha's taking the phone into the bedroom and locking the door, and Ms. Cunha's failure to respond to CR's threats to cut herself ...." Ms. Cunha did allow CR to use the phone to call for help that evening. (Exh. D14 at 13–14.) CR spoke with DHHS duty worker Charlene Musgrave privately in her room. (Exh. D14 at 13–14.) After CR spoke with Ms. Musgrave, another DHHS worker, Ms. Smith, instructed Ms. Cunha to say goodnight and go to bed. (Exh. D14 at 14.) When CR came to Ms. Cunha's door and threatened to cut herself, Ms. Cunha responded promptly, if not without hesitation. (June 16, 2008 Testimony of Lori Markie at 92–93; June 30, 2008 Testimony of Jill Cunha at 24.) CR had a history of making threats that she had never followed through with, and there is no evidence that she had threatened to harm herself on May 19, 2007, before doing so at Ms. Cunha's door. (Exh. D14 at 14.) Ms. Cunha had no reason to disregard DHHS's advice that she go to bed and instead keep CR under close watch, which is what DHHS now apparently suggests she ought to have done.

The record compels the conclusion that Ms. Cunha acted reasonably, rationally, and appropriately to the events of May 19, 2007. This is doubly apparent when the court

considers that Ms. Cunha was not licensed to care for children with CR's needs and lacked special crisis training. Her actions did not create "a threat to [CR's] health or welfare" by causing or allowing CR to harm herself. 22 M.R.S.A. § 4002(1) Rather, CR decided that she wanted to leave Ms. Cunha's home and acted out in a manner to achieve the desired result.

After CR cut herself, Ms. Cunha took prompt, rational actions to obtain medical assistance. She notified DHHS, but Ms. Smith was not able to offer immediate help. (Exh. D14 at 14.) Out of concern for the other foster children's wellbeing, and reasoning that forcing CR to remain in the home any longer risked re-escalating her crisis, Ms. Cunha drove CR to the local police/EMS station where she believed medical aid was available. Upon learning of her mistake, Ms. Cunha took CR to the hospital. She stopped briefly to check with 911 and collect CR's MaineCare card. There is no evidence that CR's injuries appeared life threatening or that she was expressing any significant discomfort, and driving to the hospital appears to have been as expeditious as calling the ambulance. (*See* AHR at 17–18.)

If Ms. Cunha's decisions were imperfect, they were still rational, reasonable, and do not reflect poor judgment. Again, Ms. Cunha's actions did not constitute "a threat to [CR's] health or welfare" rising to the level of abuse or neglect. 22 M.R.S.A. § 4002(1); *see Kane*, 2008 ME 185 ¶¶ 20, 24–26, 960 A.2d at 1201–03. The record as a whole compels the conclusion that the Commissioner erred when she substantiated that Ms. Cunha had perpetrated neglect against CR.

Regarding Ms. Cunha's treatment of the other foster children in her care, the Commissioner criticized Ms. Cunha's apparent indifference to their welfare, and found that her "consistent denial of the possibility that these children were impacted by the cutting incident demonstrates a lack of good judgment." (Final Decision at 2.) On the

26

night of May 19, 2007, the record shows that Ms. Cunha followed CR toward the kitchen and away from the children's room shortly after CR knocked on Ms. Cunha's door. One might argue that she ought to have taken the time to check on the children herself, but it was just as reasonable for her to pursue CR directly given the lack of apparent threat to the three girls. Their welfare was clearly on Ms. Cunha's mind as evinced by her desire to avoid waking them with sirens.

Following the incident, none of the children raised the issue with Ms. Cunha, their social workers, or their teachers. Their behavior was not negatively impacted; rather, they appeared to thrive. Furthermore, there is no evidence that Ms. Cunha ever denied that the girls could have been affected. Instead, Ms. Cunha asked the girls' social worker, Ms. Ianaconne, whether the girls had mentioned the incident and how it should be addressed. Ms. Ianaconne told Ms. Cunha not to bring it up and stated that she herself would not raise the issue with the children. "[A]ll the testimony and exhibits before" the agency refute the conclusion that Ms. Cunha exercised poor judgment in caring for the three young children following CR's cutting incident. *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 13, 989 A.2d at 1133.

DHHS denied the petitioners' application to renew their foster care license based on Ms. Cunha's alleged neglect of CR, lack of concern for the other three foster children, and general poor judgment. (Exh. D2 at 1–3.) As discussed above, the record compels the conclusion that Ms. Cunha did not subject CR to "abuse and neglect" as defined by 22 M.R.S.A. § 4002(1), did show concern for the other three foster children, and did not exercise poor judgment in their care. DHHS's decision to deny Ms. Cunha and Mr. Luna's license should thus be vacated.

## CONCLUSION

While some of the Commissioner's findings have weak evidentiary support in the record, she ignores other evidence credited by the hearing officer, who had the opportunity to observe and weigh the testimony first hand, that contradicts her conclusions. A fair and reasonable reading of the entire record compels a conclusion opposite that reached by the Commissioner. The Commissioner's final decision is reversed. The case is remanded with instructions to expunge Ms. Cunha's substantiation of neglect and grant petitioners' application to renew their foster license.

Dated:     July 20, 2010

G. Arthur Brennan
Justice, Superior Court

ATTORNEY FOR PLAINTIFF:
ROBERT M.A. NADEAU, ESQ.
NADEAU LEGAL PLLC
38 SOUTH RIVER ROAD
BEDFORD NH   03110-6717

ATTORNEY FOR DEFENDANT:
JANINE A. RAQUET, AAG
OFFICE OF THE ATTORNEY GENERAL
84 HARLOW STREET, 2nd FLOOR
BANGOR ME   04401

28